**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNILOC 2017, LLC et al. | § | CIVIL ACTION NOS. 2-18-cv-00491, |
| Plaintiffs, | § | -492, -493, -494, -495, -496, -497, -498, |
| v. | § | -499, -500, -501, -502, -503, -504 |
| | § | |
| GOOGLE LLC, | § | ***FILED UNDER SEAL*** |
| Defendant. | § | |
| | § | **JURY TRIAL DEMANDED** |

**RESPONSE OPPOSING GOOGLE LLC'S MOTION TO DISMISS[1] FOR LACK OF**
**STANDING AND IMPROPER VENUE UNDER RULES 12(B)(1), 12(B)(3) AND 12(B)(6)**

---

[1] Google filed nearly identical motions to dismiss in Case Nos. 2:18-cv-00491-504. Uniloc has filed an identical response ("Response") in each case to eliminate any need for this Court or Google to compare the responses for differences.  Except where indicated, citations to Google's motion in this Response refer to the pagination of Google's motion in Case No. 2:18-cv-00491.  Section III. B of this Response contains responses to case-specific arguments made in Section IV. C of Google's motions in Case Nos. 2:18-cv-00492, -00495, -00497, -00500, -00503, and -00504.  Including each case-specific argument in Section III. B made it necessary for Uniloc to exceed the page limits for a response.  Uniloc has moved for leave to exceed the page limits for this purpose.

Uniloc prefers a single set of briefings for the convenience of the parties and the Court. Google filed a notice with this Court, claiming Uniloc opposed a single set of briefing. This is incorrect.  While the parties discussed the possibility of consolidating briefing for a §1404 convenience motion Google has not yet filed (and which Uniloc anticipates will be less susceptible to consolidated briefing), Uniloc was not aware of Google's intent to file nearly identical briefs on standing and improper venue.  On April 30, Google offered to consolidate the present briefs but conditioned its offer on Uniloc agreeing to waive its right to amend its complaints.

## Table of Contents

I.      BACKGROUND ................................................................................................1

II.     UNILOC 2017 ALONE HAS STANDING .....................................................2

        A.      Any alleged right to sublicense was terminated before this case was
                filed and it cannot be disputed that Fortress has no rights in the
                patents-in-suit as of May 3, 2018.............................................................3

        B.      The Termination Agreement clearly indicates that it inures to the
                benefit of Uniloc 2017 as Uniloc Lux's assignee ....................................4

        C.      Any "Event of Default" was cured .........................................................5

        D.      CF Uniloc and Uniloc 2017 amended the Security Agreement
                before this case was filed .......................................................................6

        E.      Uniloc Lux never transferred "all substantial rights" to Fortress, and
                Uniloc 2017 never transferred "all substantial rights" to CF Uniloc ......7

                1.      Basic standard for standing in patent cases.................................7

                2.      The background of the *Mann* case ...............................................7

                3.      *Mann* explained there is always a CATEGORY
                        ONE plaintiff ..............................................................................9

                4.      Until assigning the patents-in-suit to Uniloc 2017, Uniloc
                        Lux never transferred "all substantial rights" to another. .........11

                5.      Uniloc 2017 never transferred "all substantial rights"
                        to another .................................................................................12

III.    VENUE IS PROPOER IN THIS DISTRICT UNDER SECTION 1400(b) .....15

        A.      Google has a regular and established place of business in this District.......15

                1.      This Court should take judicial notice of the evidence
                        and findings in *SEVEN Networks*. ...........................................15

                2.      Google's allegation that the GGC servers were
                        "drained" is immaterial ...............................................................15

3.     Google's GGC servers satisfy the *Cray* test ...............................16

    a.  Google's GGC servers and the place of the GGC servers
         are a "physical place"..........................................................16

    b.  Google's GGC servers and the place of those servers are
         regular and established places of business..........................18

    c.  The GGC servers and their locations are regular and
         established places of business "of the defendant" ..............21

4.     This Court should not abandon its fact-intensive approach to
        venue in favor of a bright-line rule based on the outcomes
        of *CUPP* and *BMC*......................................................................22

5.     There is no requirement of a link between alleged acts of
        infringement and a defendant's regular and established
        place of business. ......................................................................22

6.     Google's other places of business in this District.....................22

B.    The complaints in Case Nos. 2:18-cv-00492, -00495, -00497, -00500,
      -00503, and -00504 sufficiently allege Google has committed acts of
      infringement in this District ......................................................................24

1.     Google had knowledge of induced infringement at the time
        the -00492, -00495, -00497, -00500, -00503, and -00504
        complaints were filed................................................................25

2.     Google had pre-suit knowledge ................................................25

3.     Google erroneously assumes all alleged infringing activity
        must have occurred in this District. ..........................................26

4.     The -00492 complaint plausibly alleges acts of infringement
        in this District............................................................................26

5.     The -00495 complaint plausibly alleges acts of infringement
        in this District............................................................................27

6.     The -00497 complaint plausibly alleges acts of infringement
        in this District............................................................................28

7.     The -00500 complaint plausibly alleges acts of infringement
        in this District............................................................................29

8.      The -00503 complaint plausibly alleges acts of infringement
        in this District....................................................................................30

9.      The -00504 complaint plausibly alleges acts of infringement
        in this District....................................................................................30

IV.     GOOGLE CANNOT PLAUSIBLY DENY PRESUIT KNOWLEDGE.........................32

## Table of Authorities

<u>**Cases**</u>

*Achates Reference Pub., Inc. v. Symantec Corp.*,
   2:11-CV-294-JRG-RSP, 2013 WL 693955, at *3
   (E.D. Tex. Jan. 10, 2013) ........................................................................................... 26

*Alfred E. Mann Found. For Sci. Research v. Cochlear Corp.*,
   604 F.3d 1354 (Fed. Cir. 2010) ................................................................................ 9-12

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*,
   434 F.3d 1336 (Fed. Cir. 2006) .................................................................................. 11

*Azure Networks, LLC v. CSR PLC*,
   771F.3d 1336 (Fed. Cir. 2014) .................................................................................. 14

*BMC Software, Inc. v. Cherwell Software, LLC*,
   No. 1:17-cv-1074, Dkt. 55 at 3 (E.D. Va. Dec. 21, 2017) ......................................... 22

*CUPP Cybersecurity, LLC v. Symantec Corp., C.A.*
   No. 3:18-CV-01554, 2019 WL 1070869, at *2-3 (N.D.
   Tex. Jan. 16, 2019) .................................................................................................... 22

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*,
   630 F.Supp. 2d 365, 371 (D. Del. 2007) ..................................................................... 9

*Godo Kaisha IP Bridge 1 v. Intel Corp.*,
   No 2:17-cv-00676-RWS-RSP, 2018 WL 5728524, at *2
   (E.D. Tex. Aug. 29, 2018)) ......................................................................................... 16

*In re Cray Inc.*,
   871 F.3d 1355 (Fed. Cir. 2017) .................................................................................. 15

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................................... 8

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
   814 F.3d 1343 (Fed. Cir. 2016) .................................................................................... 8

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
   240 F.3d 1016 (Fed. Cir. 2001) .................................................................................... 9

*Prima Tek II, L.L.C. v. A-Roo Co.*,
  222 F.3d 1372 (Fed. Cir. 2000) ........................................................... 11

*Propat Intern. Corp. v. Rpost, Inc.*,
  473 F.3d 1187, 1189 (Fed. Cir. 2007) ..................................................... 8

*SEVEN Networks, LLC v. Google LLC*,
  315 F. Supp. 3d 933 (E.D. Tex. 2018) ............................................. *passim*

*Sicom Sys. Ltd. v. Agilent Techs. Inc.*,
  427 F.3d 971 (Fed. Cir. 2005) ......................................................... 13-14

*SiRF Technology, Inc. v. International Trade Com'n*,
  601 F.3d 1319, 94 USPQ2d 1607 (Fed. Cir. 2010) ..................................... 2

*Speedplay, Inc. v. Bebop, Inc.*,
  211 F.3d 1245 (Fed. Cir. 2000) ............................................................ 9

*Tierra Intelectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*,
  2:13-CV-44-JRG, 2014 WL 1233040, at *2 (E.D. Tex. Mar. 24, 2014) ................. 25

*Uniloc USA, Inc. v. Apple, Inc.*,
  No. C 18-00360-WHA (N.D. Cal.) (Jan. 17, 2019) ................................. 1-2, 7

*WiAV Solutions LLC v. Motorola Inc.*,
  631 F.3d 1257 (Fed. Cir. 2010) ....................................................... 8, 12

## Statutes

35 U.S.C. § 281 ......................................................................................... 8

28 U.S.C. § 1400 ..................................................................................... 15

## <u>INTRODUCTION</u>

Google's motion to dismiss Uniloc 2017 LLC's claims[1] for lack of standing rehashes the arguments already rejected by the Northern District of California in *Uniloc USA, Inc. v. Apple, Inc.*, No. C 18-00360-WHA (N.D. Cal.) (Jan. 17, 2019).  Here, Google's motion is even weaker because the alleged rights of Fortress Credit Co LLC ("Fortress") and CF Uniloc Holdings LLC ("CF Uniloc"), which Google claims deprive Uniloc 2017 LLC of standing, were terminated before Uniloc 2017 filed this case.  For this reason alone, Google's motion must be denied.  Google's motion should also be denied for the reason Judge Alsup denied Apple's motion; namely, Fortress did not obtain a right to sublicense because any alleged defaults by Uniloc (which Apple and Google claim automatically triggered Fortress's alleged right to sublicense) were cured.  Further, even if they had not been terminated, Fortress's and CF Uniloc's alleged rights would not have deprived Uniloc 2017 of constitutional standing because Uniloc Lux (and its assign Uniloc 2017) never transferred "all substantial rights" to Fortress or CF Uniloc.

Google's motion to dismiss for improper venue rehashes arguments already rejected by this Court in *SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933 (E.D. Tex. 2018) under an identical set of circumstances involving Google's GGC servers.  It should be denied for the same reasons this Court denied Google's motion in *SEVEN Networks*.  If this Court reverses *SEVEN Networks* and determines Google's GGC servers and the place of those servers do not alone resolve Google's motion to dismiss for improper venue, Uniloc requests leave to conduct venue discovery relating to Google's other places of business in this District.

Finally, Google cannot plausibly deny it had pre-suit knowledge concerning the infringement alleged in the complaints in the present cases because nearly identical complaints were filed weeks before.

## I.    BACKGROUND

It is undisputed the each of the patents-in-suit was assigned to Uniloc Luxembourg S.A. ("Uniloc Lux") on or before January 31, 2018.  *See* Loveless Decl., Ex. A.

---

[1] To eliminate any dispute about whether Uniloc USA, Inc. has standing, Plaintiffs have moved to remove Uniloc USA as a party, which will Uniloc 2017 LLC as the sole Plaintiff.

On **December 30, 2014**, Uniloc Lux and Fortress entered into a Revenue Sharing Agreement and a Patent License Agreement.  Tuner Decl., Ex. A (Patent License Agreement).

On **May 3, 2018**, Uniloc Lux and Fortress entered into a Payoff and Termination Agreement ("Termination Agreement"), terminating the Revenue Sharing Agreement and the Patent License Agreement that Google claims deprived Uniloc Lux of standing.  Tuner Decl., Ex. C.

Also, on **May 3, 2018**: (1) Uniloc Lux assigned the patents-in-suit to Uniloc 2017 LLC; and (2) Uniloc 2017 entered into a Note Purchase and Security Agreement ("Security Agreement") with CF Uniloc.  Loveless Decl., Ex. A; Turner Decl., Ex. B

On **November 16, 2018**, CF Uniloc and Uniloc 2017 entered an Amended and Restated Note Purchase and Security Agreement ("Amended Security Agreement").  Turner Decl., Ex. D. The Amended Security Agreement eliminates the language Google claims deprived Uniloc 2017 of standing.

This case was filed **after November 16, 2018**.

## II.    UNILOC 2017 ALONE HAS STANDING.[2]

As shown in the public USPTO assignment records, Uniloc 2017 alone is the undisputed owner of the patents-in-suit.  Loveless Decl., Ex. A.  The assignment "creates a presumption of validity . . . and places the burden to rebut such a showing" on Google.  *See SiRF Technology, Inc. v. International Trade Com'n*, 601 F.3d 1319, 1327–28, 94 USPQ2d 1607 (Fed. Cir. 2010).

In attempting to meet this burden, Google re-urges arguments made by Apple and already rejected by the Northern District of California.  Google first argues Uniloc 2017 lacks standing because the prior owner, Uniloc Lux, allegedly defaulted under a Revenue Sharing Agreement with Fortress, thereby giving Fortress a right to sublicense under a Patent License Agreement.

---

[2] Contrary to Google's indications in its Motion that "Google is actively seeking" confidential documents from Uniloc (see MTD at 7), Google never requested any such documents from Uniloc 2017.  Rather, on May 8, 2019, Uniloc 2017 inquired of Google what documents it sought – indicating that it would provide them.

Dkt. No. 17 ("MTD") at 6, 8-10.[3]  This argument fails for the simple reason that both the Revenue Sharing Agreement and the Patent License Agreement were terminated by Fortress and Uniloc Lux on May 3, 2018, before this case was filed.  *See* Turner Decl., Ex. C.  Further, as Judge Alsup found in an order attached to Google's own motion, any alleged defaults by Uniloc Lux under the now-terminated agreements were cured under Section 7.3 of the Revenue Sharing Agreement. *See* MTD, Ex. E at 6-7.  Finally, even if Fortress had a right to sublicense (and it did not), that right would not deprive Uniloc 2017 – the legal owner of the patents-in-suit – of constitutional standing.  A mere right to sublicense is not a transfer of "all substantial rights."

Google next argues Uniloc 2017's May 3, 2018 Security Agreement with CF Uniloc deprives Uniloc 2017 of standing.  But as Google knows from Judge Alsup's order, in November 2018, CF Uniloc and Uniloc 2017 amended the Security Agreement to address the allegedly offending language in the Security Agreement.  *See* Turner Decl., Ex. D; *see also* MTD, Ex. E at 8-9.  Further, even prior to its amendment, the Security Instrument did not transfer all substantial rights to CF Uniloc.

> ### A.  Any alleged right to sublicense was terminated before this case was filed and it cannot be disputed that Fortress has no rights in the patents-in-suit as of May 3, 2018.

Fortress's alleged right to sublicense under the Revenue Sharing Agreement and Patent License Agreement cannot deprive Uniloc 2017 of standing because those agreements were terminated by the May 3, 2018 Termination Agreement.  Turner Decl., Ex. C.  The Termination Agreement states, in relevant part:



---

[3] Except where indicated, citations to Google's motion in this Response refer to the pagination of Google's motion in Case Nos. 2:18-cv-00491.

[4] Section 1(d)(ii) required the Collateral Agent to notify the Depositary Bank the Blocked Account Control Agreement was to terminate.

████████████████████████████████████████████████

████████████████████████████████

*Id.* at 2 (¶1(d)(i)) (emphasis added). ████████████████████████████

████████████████████████████████████████ *See* Turner

Decl. ¶7.

Google acknowledges the Termination Agreement but incorrectly insists "[t]ermination of an agreement alone does not extinguish an irrevocable license, such as Fortress's here."  MTD at 11.  The cases Google cites do not say parties to an irrevocable license may not mutually agree to terminate their agreement.  They do not even involve situations where parties mutually agreed to terminate their agreement.  Rather, they involve situations where one party sought to revoke a license based on an alleged material breach by the other party.[5]  And they hold that a material breach does not give a party a right to revoke an irrevocable license.  *Id.*  Those cases are not analogous to the facts here.  Rather, as they were free to do[6], Uniloc and Fortress mutually agreed to terminate the Revenue Sharing Agreement and the Patent License Agreement.  As a result, any rights Fortress may have had in the patents-in-suit (it had none) were affirmatively given up by Fortress in the May 3, 3018 Termination Agreement.

### B. The Termination Agreement clearly indicates that it inures to the benefit of Uniloc 2017 as Uniloc Lux's assignee.

Contrary to Google's claim that "Uniloc Lux's prior grant of rights to Fortress . . . vested before Uniloc Lux purported to assign the patents to Uniloc 2017," the Termination Agreement: (a) acknowledged Uniloc Lux would be assigning its rights to Uniloc 2017; and (b) clearly indicates the Termination Agreement inures to Uniloc 2017's benefit.

---

[5] *Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 400 (5th Cir. 2008) (we find that the PLA could not be terminated, notwithstanding a material breach of the agreement. Otherwise, the terms "irrevocable" and "perpetual" would be rendered superfluous, in contravention of established rules of contract interpretation); *Matter of Provider Meds, L.L.C.*, 907 F.3d 845, 856 (5th Cir. 2018), cert. denied sub nom. RPD Holdings, L.L.C. v. Tech Pharmacy Services, 139 S. Ct. 1347 (2019) ("the use of 'irrevocable' goes one step further and indicates that the license may not be revoked for any reason, even a breach by the other side").
[6] *Thales Alenia Space France v. Thermo Funding Co., LLC*, 959 F. Supp. 2d 459, 465 (S.D.N.Y. 2013) ("Parties to a contract may mutually agree to cancel and rescind the contract. In addition, one party to an agreement may release another of a duty owed to the maker of the release, and thus discharge the duty upon the occurrence of any conditions provided for in the release. The duty that is released need not be matured. A release of a preexisting obligation can occur at the same time the parties enter into a new agreement, in which case the new promise is not inadequate consideration under the preexisting duty rule.")

A recital to the Termination Agreement specifically acknowledged ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Turner
Decl., Ex. C at 1.  Further, the release provision in the Termination Agreement ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 4 (¶ 2(b)) (emphasis added).
The Termination Agreement further states that it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 6 (¶4(c)) (emphasis
added).

Thus, far from having an unfettered and irrevocable right to sublicense when Uniloc 2017
acquired the patents-in-suit, Fortress fully released and relinquished any right to sublicense as part
of the Termination Agreement – an agreement that expressly inures to the benefit of Uniloc 2017.

**C.    Any "Event of Default" was cured.**

Even if the Revenue Sharing Agreement and Patent License Agreement had not been
terminated, Google's motion would fail because any event of default giving Fortress a right to
sublicense was cured.  Prior to their termination, the Revenue Sharing Agreement and the Patent
License Agreement allowed Fortress to use its license *only* "following an Event of Default."
Palmer Decl., ¶4; MTD, Ex. Ex. D §2.1.  The Northern District of California already rejected the
argument that alleged defaults by Uniloc Lux (the same defaults alleged by Google) gave Fortress
a right to sublicense.  There, Judge Alsup correctly found that even if there were events of default,
"they were annulled under Section 7.3 of the Revenue Sharing Agreement."  *See* MTD, Ex. E at
6. Section 7.3 of the Revenue Sharing Agreement states:

> Once an Event of Default has occurred, such Event of Default shall be deemed to
> exist and be continuing for all purposes of this Agreement until the earlier of (x)
> Majority Purchasers shall have waived such Event of Default in writing, *(y) the
> Company shall have cured such Event of Default to the Majority Purchasers'
> reasonable satisfaction* or the Company or such Event of Default otherwise ceases
> to exist, or (z) the Collateral Agent and the Purchasers or Majority Purchasers . . .
> have entered into an amendment to this Agreement which by its express terms cures
> such Event of Default, at which time such Event of Default shall no longer be
> deemed to exist or to have continued.

MTD, Ex. D ¶7.3 (emphasis added); *see also* MTD, Ex. E at 6.

Judge Alsup based his findings on (1) evidence Fortress chose to execute a third amended Revenue Sharing Agreement with Uniloc on May 15, 2017, showing it was reasonably satisfied with Uniloc's performance; and (2) the November 9, 2018 declaration of James Palmer, Managing Director in the Intellectual Property Finance Group at Fortress Investment Group, testifying Fortress was satisfied with Uniloc's performance and "at no time, either before or after May 15, 2017, did Fortress consider Uniloc as being in default, or believe Fortress had a right to license Uniloc's patents. . ."  *Id.*; *see also* Palmer Decl., ¶13 (attached).  Mr. Palmer executed a second declaration on March 13, 2019, re-affirming that Fortress was satisfied with Uniloc's monetization revenues, did not regard Uniloc as being in default, and considered any alleged "Event of Default" cured to Fortress's satisfaction.  *See* Second Palmer Decl. ¶¶ 1-3 (attached).

Google's argument that the May 15, 2017 amendment could not cure Uniloc's defaults because certain alleged defaults occurred after May 15, 2017 misses the point.  *See* MTD at 10-11.  The May 15 amendment, together with the Palmer declarations, prove Uniloc cured any alleged default to Fortress's "reasonable satisfaction."  As Judge Alsup observed:

> Under these circumstances, however, Fortress's conduct *and* representations in the Palmer declaration can only be understood as excusing of the purported default(s) — amounting to a cure — by Fortress.

*See* MTD, Ex. E at 7 (emphasis in original).

### D.    CF Uniloc and Uniloc 2017 amended the Security Agreement before this case was filed.

Google's allegation that the Security Agreement between Uniloc 2017 and CF Uniloc deprives Uniloc 2017 of standing fails because the allegedly offending provisions of the Security Agreement were amended before Uniloc 2017 filed this case.  Turner Decl., Ex. D.

The May 3, 2018 Security Agreement gave CF Uniloc a security interest in certain Uniloc 2017 assets ("Collateral"), including certain patents. *See* MTD, Ex. K ¶4.1.  Section 7.1 of the Security Agreement required Uniloc 2017 to obtain prior written consent of CF Uniloc before taking certain actions, including certain actions affecting Collateral.  *Id.* ¶7.  Google claims Section 7.1 deprives Uniloc 2017 of standing by allegedly "limiting Uniloc 2017's ability to

control the enforcement and disposition of the asserted patents." MTD at 12.

On November 16, 2018, however, CF Uniloc and Uniloc 2017 amended the Security Agreement to address the allegedly offending provisions. 

\* \* \*



Turner Decl., Ex. D §4.9(e). To remove any doubt about the intent of ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at §7.1. The Amended Security Agreement, therefore, removes the alleged limitations Google claims deprive Uniloc 2017 of standing. Judge Alsup acknowledged this in his order denying Apple's motion to dismiss for lack of standing. *See* MTD, Ex. E at 9. (noting Uniloc 2017 "removed the allegedly offending provisions in Uniloc 2017's agreement with CF Uniloc" in November 2018). The Amended Security Agreement does not deprive Uniloc 2017 of standing.

### E. Uniloc Lux never transferred "all substantial rights" to Fortress, and Uniloc 2017 never transferred "all substantial rights" to CF Uniloc.

The Termination Agreement and the Amended Security Agreement are, alone, fatal to Google's motion. Even absent the Termination Agreement and the Security Agreement, however, Google's motion fails because Uniloc Lux never transferred "all substantial rights" to Fortress,

---

[7] Sections 4.7-4.8 and 8 allow CF Uniloc to take certain actions *only* after an Event of Default under the Amended Security Agreement and *only* after CF Uniloc "provides written notice to [Uniloc 2017]" of the default. CF Uniloc has not provided written notice to Uniloc 2017 of any Event of Default. Turner Decl. ¶6.

and Uniloc 2017 never transferred "all substantial rights" to CF Uniloc.

### 1.  Basic standard for standing in patent cases

Bringing a patent action requires that a plaintiff have both constitutional and prudential standing. *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1376-77 (Fed. Cir. 2000). Google argues only a lack of constitutional standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

As to constitutional standing, those who might file an infringement action can be divided into three categories: CATEGORY ONE is a person or entity with constitutional standing to sue in its own name alone. It is usually referred to in judicial opinions as the "owner," "effective owner," or "assignee" of the patent, or as an "exclusive licensee" who has received "all substantial rights" from the owner. Its standing derives from the Patent Act, which provides a "patentee" is entitled to bring a civil action "for infringement of his patent." 35 U.S.C. § 281. "Patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." *Id.* § 100(d).  Those provisions of the Patent Act have been interpreted to require an infringement suit "ordinarily be brought by a party holding legal title to the patent." *Propat Intern. Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007). The exception would be where the party holding legal title transfers "all substantial rights" in the patent to another, in which case the transferee obtains CATEGORY ONE status. *Id.*

CATEGORY TWO is a person or entity who has some exclusionary rights in the patent, but not enough to qualify as CATEGORY ONE. It is most often referred to in judicial opinions as an "exclusive licensee" who has not received "all substantial rights." *See, e.g.*, *Prima Tek*, 222 F.3d at 1377. It has constitutional standing, but principles of prudential standing usually require it to join, as a coplaintiff, the CATEGORY ONE plaintiff. *Id.*; *WiAV Solutions LLC v. Motorola Inc.*, 631 F.3d 1257, 1264-65 (Fed. Cir. 2010); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1350 (Fed. Cir. 2016).

CATEGORY THREE is a person who does not fall into either CATEGORY ONE or TWO, and thus has no constitutional standing. *Prima Tek*, 222 F.3d at 1377.

### 2.  The background of the *Mann* case

Most patent cases in which the issue of standing is discussed have a familiar pattern.  The person to whom the patent was issued or assigned (usually referred to as the "owner") grants an "exclusive" license to another person.  The court then examines the rights the license transferred, to determine whether those rights are sufficiently exclusive to give the recipient constitutional standing, and whether the patent rights the "owner" had retained require it to be named as a co-plaintiff (the latter being a question of prudential, not constitutional, standing). *See*, *e.g.*, *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016 (Fed. Cir. 2001); *see also Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1342 (Fed. Cir. 2014).  But, there is generally always a CATEGORY ONE plaintiff or co-plaintiff, either already in the case or potentially to be named.

In September 2007, the Federal Circuit issued *Morrow*, which had a somewhat different fact pattern. In that case, the entity that had been the patent owner (AHC) went bankrupt and went out of business. In the bankruptcy, the various creditor groups agreed to distribute differing portions of the rights in the patent to three separate entities. The court ruled the named plaintiff (GUCLT), the one of those three entities to which the creditors had given the right to sue, was a CATEGORY THREE plaintiff, and thus did not have constitutional standing. Following that decision, there was a concern in the patent bar that the principles discussed in the opinion, if later extended beyond the case's holding in a bankruptcy context, might result in *no one* having constitutional standing to bring suit on a patent, depending upon how the various rights had been divided up. (Indeed, a district court seemed to have accepted that possibility. *Fairchild Semiconductor Corp. v. Power Integrations, Inc*., 630 F.Supp. 2d 365, 371 (D. Del. 2007)). Because that result would be unsatisfactory (and presumably unintended), the bar expected the Federal Circuit to clarify that issue, in some future case. *Mann* was that case.  *See Alfred E. Mann Found. For Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010).

### 3.  *Mann* explained there is always a CATEGORY ONE plaintiff.

In *Mann*, the patents, when issued, were assigned to AMF. AMF later gave certain rights to a separate entity, AB, and retained others. AMF then sued Cochlear, which moved to dismiss for lack of constitutional standing, claiming AMF had not retained sufficient rights to be a

CATEGORY ONE plaintiff. The opinion described the relevant principles in terms of a transfer of rights from an owner/licensor who, before the transfer, had possessed all substantial rights in the patent (and thus had CATEGORY ONE status) to an "exclusive licensee." *Mann* held:

> A patent owner may transfer all substantial rights in the patent-in-suit, in which case the transfer is tantamount to an assignment of those patents to the exclusive licensee, conferring standing to sue solely on the licensee. . . . [¶] This happens when the exclusive license transfers "all substantial rights" in the patents. When this happens, the exclusive licensee has sole standing to sue those suspected of infringing the patents' claims. . . . This case presents a . . . scenario in which the patent owner seeks to bring suit, requiring us to determine whether the patent owner transferred away sufficient rights to divest it of any right to sue.
>
> * * *
>
> [A] patent may not have multiple separate owners for purposes of determining standing to sue. ***Either the licensor did not transfer "all substantial rights" to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement***, or the licensor did transfer "all substantial rights" to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own. In either case, *the question is whether the license agreement transferred sufficient rights to the exclusive licensee to make the licensee the owner of the patents in question. If so, the licensee may sue but the licensor may not. If not, the licensor may sue, but the licensee alone may not.*

604 F.3d at 1358-60 (citations omitted) (emphasis added). This portion of *Mann* resolved the lingering issue from *Morrow*, by ruling out a scenario where *no one* has standing to sue on a given patent.

The opinion established a default rule: One who possesses sufficient rights to qualify as the sole CATEGORY ONE plaintiff maintains that status unless and until it transfers "all substantial rights" to another, after which that other qualifies as the CATEGORY ONE plaintiff. In a situation where a CATEGORY ONE plaintiff transfers some rights – but not "all substantial rights" – that entity retains CATEGORY ONE status (including the "right to sue for infringement").

**4. Until assigning the patents-in-suit to Uniloc 2017, Uniloc Lux never transferred "all substantial rights" to another.**

Here, Uniloc Lux obtained CATEGORY ONE status when it obtained legal title to the patents-in-suit – as established by the publicly available assignment records at the USPTO. Loveless Decl., Ex. A.  Uniloc Lux did not transfer all substantial rights to Fortress. Even if Fortress had obtained a right to sublicense, by the express terms of the Patent License Agreement, that right was *nonexclusive*. Turner Decl., Ex. A.  Such a limited, nonexclusive right is far short of a grant of "all substantial rights" in the patents. Thus, under *Mann*, Fortress's purported right to sublicense in the event of a default could not have deprived Uniloc Lux of its CATEGORY ONE status.

Reinforcing *Mann* are several Federal Circuit cases that found a person with CATEGORY ONE status maintains that status, despite having transferred a right to sublicense:

In *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006), the action was filed by Contour, the original owner of the patent (and thus the original holder of CATEGORY ONE status). The court held Contour maintained its CATEGORY ONE status, despite having transferred to another person "the exclusive right to make, use, and sell" products covered by the patent and a "virtually unfettered right to sublicense all of its rights to a third-party," and Contour "retained 'no supervisory power or veto power'" over that person's grant of sublicenses.

In *Assymetrix*, the original owner (Harvard) was held to have CATEGORY ONE status, even though it had transferred to a licensee (Assymetrix) the right to grant sublicenses. 582 F.3d at 1316.

In *Prima Tek*, the original owner (Southpac) was held to have maintained its CATEGORY ONE status, even though another person (Prima Tek II) had a right to grant additional licenses. 222 F.3d at 1375.

And in *Mann* itself, the original owner (AMF) retained its CATEGORY ONE status, even though it had transferred to an exclusive licensee (AB) a right to grant sublicenses. 604 F.3d at 1362.

Google bases its argument – a person cannot be a CATEGORY ONE plaintiff if another

11

person has a right to license – on dicta from *WiAV*, 631 F.3d at 1266. Mot. at 13.  But that case did not present the issue here, which is determining what defines CATEGORY ONE status.  There, WiAV had already added the CATEGORY ONE entity (referred to in that opinion as the "patent owner") as an involuntary defendant, to obviate any prudential standing issue. *Id.* at 1265 n.1. Rather, WiAV claimed standing as a CATEGORY TWO plaintiff, as the holder of an *exclusive* license to the relevant patents. Because CATEGORY TWO status requires exclusivity, the issue was whether another's right to license those patents deprived plaintiff of its exclusivity, and thus of its CATEGORY TWO status.

Google cites similar dicta from *Luminara*, 814 F.3d at 1348. Mot. at 12-13. In that case, a nonparty, Disney, owned the patent and, before granting an exclusive license to Candella, Luminara's predecessor, thus had CATEGORY ONE status. The question for the court was whether the exclusive license transferred "all substantial rights" from Disney to Candella, giving Candella, instead of Disney, CATEGORY ONE status. Defendant argued Disney's retention of the right to license certain of its affiliates rendered the transfer insufficient to bestow CATEGORY ONE status on Candella. In that context, the court said that if Disney were free to license "any" entity, "all substantial rights" would not have been transferred. *Id.* But the court found Disney had not retained that right.

*Luminara* actually supports Plaintiffs' position by suggesting, albeit in dicta, that where two persons simultaneously have the right to license, CATEGORY ONE status is retained by whomever had it before that situation arose. Neither *WiAV* or *Luminara* conflicts with the default rule of *Mann*, under which a person who has CATEGORY ONE status would retain that status unless and until he transfers "all substantial rights" to another.

### 5.  Uniloc 2017 never transferred "all substantial rights" to another.

Uniloc 2017 obtained CATEGORY ONE status when it obtained legal title to the patents-in-suit from Uniloc Lux.  Uniloc 2017 never lost CATEGORY ONE status because it never transferred "all substantial rights" to another.  The rights granted CF Uniloc under the Security Agreement were those designed to protect CF Uniloc's security interest: (1) consent to assignment or transfer of the patents; and (2) consent to settlement of any litigation regarding the patents.

Turner Decl., Ex. D.  Even absent the changes under the Amended Security Agreement, these limited rights would not have been a transfer of "all substantial rights" to another.

Google misconstrues both the facts and the law under *Sicom Sys. Ltd. v. Agilent Techs. Inc.*, 427 F.3d 971 (Fed. Cir. 2005).  *See* MTD at 12 (claiming the court found Sicom "did not have all substantial rights to patent-in-suit as it had to receive prior written consent to settle litigation and to sublicense or assign its rights").

First, Sicom was not the owner of the patent.  Rather, Sicom was a licensee with a *nonexclusive* license from the patent owner (the Canadian government).  *Sicom Sys., Ltd.*, 427 F.3d at 973.  Thus, the legal question in *Sicom* was not (as it is here) whether the patent owner has standing.  The court explained:

> *A nonexclusive license confers no constitutional standing* on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement.
>
> * * *
>
> While a licensee normally does not have standing to sue without the joinder of the patentee (to prevent multiplicity of litigation), *an exclusive license may be treated like an assignment for purposes of creating standing if it conveys to the licensee all substantial rights*. This court has defined "all substantial rights" as those rights sufficient for the licensee or assignee to be "deemed the effective patentee under 35 U.S.C. § 281."

*Sicom Sys., Ltd.*, 427 F.3d at 976 (cleaned up) (emphasis added).

Second, the court did not find Sicom lacked standing merely because it was required to obtain consent from the patent owner to settle litigation or assign its rights, as Google's parenthetical implies.  Rather, the court found Sicom could not be considered an "effective patentee" because (a) it had only a nonexclusive license and (b) the patent owner reserved numerous rights:

> Canada has reserved for itself the right to continue operating under the patented technology, as well as a multitude of other rights, including: the right to veto Sicom's reassignment of its rights or proposed sublicenses; the right to levy additional royalties or other consideration; the right to grant contracts and sub-contracts to further develop the invention claimed in the patent; and the right to offer sublicenses under any improvements or corrections developed by Sicom. Indeed, Canada also retained the right to sue for infringement other than commercial infringement and it retained legal title to the patent.

\* \* \*

> In light of Canada's right to permit infringement in certain cases, the requirement that Sicom consent to certain actions and be consulted in others, and the limits on Sicom's right to assign its interests in the patent, we hold that the Agreement transfers fewer than all substantial rights in the patent from Canada to Sicom.

*Sicom Sys., Ltd.*, 427 F.3d 978-980.  *Sicom* does not support Google's claim that a patent owner with CATEGORY ONE standing loses "all substantial rights" merely because a security instrument requires it to obtain a creditor's consent to settle litigation or assign the patent.

The other cases Google cites (*Azure*[8] and *Juniper*[9]) involve patent owners who, unlike Uniloc 2017, lost standing by transferring *inter alia*, exclusive licenses.  *Azure* and *Juniper* only demonstrate the vast difference between the minimal rights given CF Uniloc under the Security Agreement and what is necessary to constitute a transfer of "all substantial rights."  The court in *Azure* found a transfer of all substantial rights because the patent owner gave Azure "the exclusive, worldwide, transferable right to (i) make, have made, use, sell, offer to sell, import, and lease any products, (ii) use and perform any method, process, and/or services, and (iii) otherwise practice any invention in any manner under the '129 patent."  *Azure*, 771 F.3d at 1341.  The court found it "vitally important" that the assignment gave an exclusive right to make, use and sell the products.  *Id.* at 1343.  It also found it critical that the assignee had the exclusive right to sue for infringement. *Id.*  Similarly, in *Juniper*, the rights granted by the patent owner included an exclusive right to "initiate, maintain, manage, resolve, conclude and settle all arrangements and activities in connection with any and all licensing or litigation or enforcement efforts."  2010 WL 2898298, at \*4.  No such rights were granted by Uniloc 2017.  Rather, it is undisputed CF Uniloc was not given an exclusive license.

---

[8] *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336 (Fed. Cir. 2014), *cert. granted, judgment vacated*, 135 S. Ct. 1846, 181 L. Ed. 2d 720 (2015)
[9] *Enhanced Sec. Research, LLC v. Juniper Networks, Inc.*, CIV.A. 09-871-JJF, 2010 WL 2898298 (D. Del. July 20, 2010)

### III.   VENUE IS PROPER IN THIS DISTRICT UNDER SECTION 1400(b).

Google's motion to dismiss for improper venue must be denied because, as this Court already determined under an identical set of facts involving Google's GGC servers, venue is proper.  Further, there have been acts of infringement in this District.

Section 1400(b) of Title 28, United States Code states:

> Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.

The Federal Circuit has interpreted the phrase "has a regular and established place of business" to mean: (1) the defendant has a physical place of business; (2) the place is regular and established; and (3) the place is a place of business "of the defendant."  *See generally In re Cray Inc.*, 871 F.3d 1355 (Fed. Cir. 2017).

Most of Google's motions dispute only whether Google has a regular and established place of business in this District.  In Case Nos. 2:18-cv-00492, -00495, -00497, -00500, -00503, and -00504, Section IV. C of Google's motions dispute whether there have been acts of infringement in this District.  These case-specific allegations are addressed in Section III. B below.

### A.   Google has a regular and established place of business in this District.

Google's motion must be denied because this Court already found in *SEVEN Networks* that Google has a regular and established place of business in this District.  Google does not allege the facts existing when this suit was filed were any different from the facts considered in *SEVEN Networks*.  This Court should, therefore, reach the same conclusion based on the same facts.

#### 1.   This Court should take judicial notice of the evidence and findings in *SEVEN Networks*.

Uniloc requests that this Court take judicial notice of (a) this Court's own factual findings in *SEVEN* Networks and (b) the evidence that supported those findings.  If this Court believes it is necessary for Uniloc to attach the same evidence to satisfy the burden of proof, Uniloc requests leave to conduct limited venue discovery and supplement its response.  Further, to the extent not challenged by Google, the allegations concerning Google's GGC servers in Uniloc's complaint should be taken as true.

#### 2.   Google's allegation that the GGC servers were "drained" is immaterial.

15

Google's allegation that the GGC servers located in this District "ceased serving traffic[10] on November 23, 2018, just six days after" this case was filed is immaterial because (as Google recognizes later in its own motion) "[c]ourts determine venue under § 1400(b) by the facts and situation as of the date the suit is filed."  Dkt. No. 17 at 32 (citing *Godo Kaisha IP Bridge 1 v. Intel Corp.*, No 2:17-cv-00676-RWS-RSP, 2018 WL 5728524, at *2 (E.D. Tex. Aug. 29, 2018)).

### 3.  Google's GGC servers satisfy the *Cray* test.

Section 1400(b) of Title 28, United States Code states:

> Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.

### a.  Google's GGC servers and the place of the GGC servers are a "physical place."

Google's "GGC server itself and the place of the GGC server, both independently and together, meet the statutory requirement of a 'physical place.'"  *SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. at 951–54.   Google's claim that it "does not own, lease, or control the space where the [GGC] servers are kept" (Dkt. No. 17 at 22) should be rejected here for the same reasons the same false allegation[11] was rejected in *SEVEN Networks:*

> Here . . . there is more than merely a virtual space or electronic communications from one person to another. The "place" is specifically localized: a physical server occupying a physical space. Not only does Google exercise exclusive control exercised over the digital aspects of the GGC, Google exercises exclusive control over the physical server and the physical space within which the server is located and maintained.

> In this regard, the Court has considered the Beta Service Agreement: Google Global Cache (GGC) Service between Google and Suddenlink ("the Suddenlink Agreement") (Dkt. No. 141-23).  It reveals that Google exacts far more control than may be suspected from a general lease arrangement. Google requires ISPs such as Suddenlink to provide "[r]ack space, power, network interfaces, and IP addresses, as specified in the following table [omitted], in consultation with Google"; "[r]emote assistance and installation services described in SCHEDULE 'A' "; "[n]etwork access between the Equipment and Host network subscribers"; and

---

[10] Google's declaration claims the GGC servers were "drained" on November 23 and therefore no longer cached any data.  Dkt. No. 17-5 ¶13.

[11] *Seven Networks, LLC v. Google LLC*, 315 F. Supp. at 950 ("Google disputes that it leases anything.  (Dkt. No. 148 at 5 ('Google does not own, lease, or otherwise exercise possession or control over the ISPs' buildings or rooms housing the GGC servers in this District')).  This is a principal objection and will be addressed *infra*.").

"[r]emote high bandwidth access, sufficient for Google to download upgrade images of GGC to the Equipment, unless separate arrangements are agreed with Google." (Dkt. No. 141-23 at 1).

The Suddenlink Agreement makes it clear that the ISP does not own the server(s); Google owns the servers. (Dkt. No. 141-23 at 2 (In the event of termination of the Agreement: "Host will remove, package and ship (shipping charges will be pre-paid directly by Google to the carrier, and Host will undertake such removal and packaging to be undertaken in a commercially reasonable manner) all Equipment back to Google within fifteen (15) calendar days of effective date of termination. If Host fails to do so, Google will have the right to: (a) charge Host and Host will pay the fair market value of the Equipment; or (b) recover and take possession of such Equipment, and for this purpose may enter any premises of Host where such equipment is located during normal working hours to remove Equipment. Host will promptly surrender the Equipment to Google in as good order and condition as originally delivered, reasonable wear and tear excepted.") (emphasis added) ). Google is not even required to replace faulty servers under the Suddenlink Agreement. (Dkt. No. 141-23 at 7 ("Google Services: Google will provide the following services in beta: ... 3. replace faulty Equipment (at Google's cost and sole discretion)")).

This Agreement is not a mere lease of digital space or computing power; it is the installation of Google's own servers in a physical space that becomes Google's. Following installation of the GGC server, the ISP is required to provide Google explicit details regarding Google's server's installation location. (Id. at 3 ("Contact & Location Details: As soon as practicable after the Effective Date, the parties will advise each other in writing (which may be sent electronically) of the following: ... (c) Equipment location (address/floor/rack)") ). Once installed, it is considered a permanent fixture. There is no dispute that the Suddenlink Agreement requires that, in order for an ISP to move a previously installed GGC from one location to a new location, it must secure Google's permission, which Google may not permit "at its sole discretion." (Dkt. No. 141-23 at 2 ("Change Notification: Host will provide Google no less than thirty (30) days' written notice of any proposed relocation of the Equipment or change of IP address. Host may propose relocation at any time. Google, at its sole discretion, may elect not to accept the proposed relocation but will reasonably consider any such relocation and discuss all reasonable options with Host.") (emphasis added)).

Google's ownership of the server and its contents is absolute, as is Google's control over the server's location once it is installed. (Dkt. No. 141-24 at 2 ("Restriction on Use of Equipment: All ownership rights, *953 title, and intellectual property rights in and to the Equipment shall remain in Google and/or its licensors. THE EQUIPMENT OR ANY PORTION THEREOF MAY NOT BE USED, COPIED, TRANSFERRED, REVERSE-ENGINEERED, OR MODIFIED EXCEPT AS EXPRESSLY PERMITTED BY THIS AGREEMENT. Host must not, without the prior written consent of Google (which may be withheld in its sole discretion), access, use, or dispose of the Equipment, in whole or in part.") (emphasis added)).

This is not a partnership, wherein an ISP may independently act on Google's behalf in administering the GGC. To the contrary, the Suddenlink Agreement expressly disclaims any such relationship. (Dkt. No. 141-24 at 2 ("No Partnership, No Exclusivity: The parties are independent contractors, and this Agreement does not create an agency, partnership or joint venture. This Agreement is not intended to, nor does it create, any agency, partnership, joint venture or other profit-sharing arrangement, nor does it create an exclusive relationship between the parties. This Agreement places no restrictions of any type on either party's ability to freely compete or to enter into agreements with other entities or individuals.")).

Indeed, Google's total control over the GGC server's physical presence within the ISP may be best illustrated by the Suddenlink Agreement's requirement that tasks such as the "physical switching of a toggle switch;" "power cycling equipment (turning power on and/or off);" and "tightening screws, cable ties, or securing cabling to mechanical connections, plug;" may be performed "only with specific and direct step-by-step instructions from Google." (Dkt. No. 141-23 at 6) (emphasis added).

**This level of control in the physical world exemplifies how the physical presence of the GGC server within this District constitutes more than "merely" "a virtual space or [ ] electronic communications from one person to another." *In re Cray*, 871 F.3d at 1362. Indeed, such control in the physical realm over a specific physical space establishes that, irrespective of the determinations related to the other § 1400(b) requirements, there is a physical place which this Court may examine to determine if it is a regular and established place of business and whether it is a place of the defendant. Accordingly, the Court finds that, in this case, the GGC server itself and the place of the GGC server, both independently and together, meet the statutory requirement of a "physical place."**

*Seven* Networks*, LLC v. Google LLC*, 315 F. Supp. 3d at 951–54, 965 (emphasis added) (cleaned up).  For the same reasons, this Court should again find Google's GGC server itself and the place of the GGC server, both independently and together, meet the statutory requirement of a physical place.

> **b.  Google's GGC servers and the place of those servers are regular and established places of business.**

Further, for the reasons already explained by this Court, the "GGC servers and their several locations within this District constitute 'regular and established place[s] of business' within the meaning of the special patent venue statute."  *SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. 3d at 964.

Google's arguments against this finding are the same arguments rejected in *SEVEN Networks*.  Google again argues: (1) its "GGC servers are not computers made by Google" and are

instead "off-the-shelf computers made by third-party manufactures; (2) Google "does not own, lease, or control the space where the servers are kept"; (3) "[n]o Google employee has ever seen or visited the servers in this District"; and (4) its service agreements may be terminated at any time). *See* Dkt. No. 17 at 21-22.

These arguments were addressed, and rejected, by this Court in *SEVEN Networks*.  *See SEVEN Networks, LLC*, 315 F. Supp. at 954–64.  For example, contrary to Google's insistence "that business must be carried out by employees or agents of the defendant physically present at the place of business" (Dkt. No. 17 at 20), this Court found § 1400(b) "does not countenance the addition of a further human-centric requirement at the place of business."  *SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. at 964 (noting that an "extra-statutory requirement of human-centric activity" would render the exemption for Automated Teller Machines superfluous).

And in response to Google's argument that the servers are not regular and established because the agreements between Google and the ISPs allow either party to terminate at any time for any reason, this Court stated:

> The Court disagrees [with Google]. A business which has a five-year agreement is certainly no less established with a month remaining on the lease than it is in the first year of the lease. A month-to-month agreement which has endured for years is clearly "regular and established." There is little question that Google intends the GGC servers to be a "[s]calable long term solution for edge content distribution," and it is undisputed that they have been such a solution in this District for years. (Dkt. No. 141-18 (Mike Axelrod, The Value of Content Distribution Networks and Google Global Cache) at 10; Dkt. No. 141 at 19). The fact that the Suddenlink Agreement may be terminated is not evidence that Google's presence in this District is somehow less than "regular and established." Few sophisticated transactional documents fail to have one or more escape clauses, but nothing about such provisions makes the commercial targets addressed less than established.

*SEVEN Networks*, 315 F. Supp. at 957.

Google also relies on the same authority this Court rejected in *SEVEN Networks*.[12]  As this Court previously recognized, *HomeBingo* "stands for the proposition that Google's GGC server

---

[12] *See* Dkt. No. 17 at 17, 19, 24 (citing *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016); *Peerless Network, Inc. v. Blitz Telecom Consulting*, LLC, No. 17-CV-1725 (JPO), 2018 WL 1478047, at *4 (S.D.N.Y. Mar. 26, 2018); *Personal Audio, LLC v. Google, Inc.*, 280 F.Supp.3d 922, 934 (E.D. Tex. 2017); *CDx Diagnostic, Inc. v. United States Endoscopy Grp., Inc.*, No. 13-CV-5669(NSR), 2018 WL 2388534, at *3 (S.D.N.Y. May 24, 2018); *HomeBingo Network, Inc. v. Chayevsky*, 428 F.Supp.2d 1232, 1250 (S.D. Ala. 2006)).

may not establish that Sundar Pichai (Google LLC's CEO) has a regular and established place of business within this District." *SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. at 954–64. *HomeBingo* "does nothing to demonstrate that the GGC server should not be considered a regular and established place of business as to Google." *Id.* Further, *Magee* is not a beneficial comparison because it involved whether a vending machine was a "sales establishment" under the ADA, not whether it was a regular and established place of business under the venue statute). *Id.* Moreover, this Court rejected *Peerless Network, Inc.*'s finding that "some employee or agent of the defendant [must] be conducting business at the location in question" because this requirement "finds no basis within the language of the statute, nor does it accord with conceptions of places of business stretching back to at least the turn of the 20th century." *SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. at 962.

Citing *Regents of Univ. of Minn. v. Gilead Scis., Inc*., *CDx Diagnostic, Inc.*, Google insists the GGC servers should be treated like lockers. This Court already acknowledged *CDx Diagnostic, Inc.* and squarely rejected the notion that Google's GGC servers are mere storage lockers:

> The vast majority of business organizations require and utilize some form of storage or logistics. Of course, businesses may store items at *other* business's locations (like, for example, Fulfillment by Amazon) wherein goods are stored by third parties at the third parties' discretion and with no control over the location, management, or daily supervision of the products in storage. Such an arrangement can scarcely be considered to render the physical location of the stored items a place of business as to the party whose goods are stored. However, were that same party to integrate the storage arrangement into its own logistical operations (similar to, for example, Amazon and its relationship with its own fulfillment centers), there can be little doubt that the storage warehouses are places of business, *even if the public never interacts with the warehouse.*
>
> Here, the GGC servers are best characterized as local data warehouses, storing information in local districts to provide Google's users with quick access to the cached data, avoiding the delays associated with distant data retrieval from Google Data Centers. (Dkt. No. 141 at 4). This type of logistical positioning is commonplace for larger corporate interests, especially where prompt delivery is a core aspect of a business strategy. This is the case with Google. Holding that Google's business done at and through the GGC servers faithfully comports with the language of the statute; it is the logical result this Court has reached

*SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. at 960–61.

### c. The GGC servers and their locations are regular and established places of business "of the defendant."

For the same reasons sated in *SEVEN Networks*, here Google's GGC servers are "of the defendant," namely:

> There is little doubt that both the server and the physical location in and at which it resides is under the exclusive control of Google. The rack space allotted for the GGC server is "provided" to Google. (Dkt. No. 141-23 at 6 ("Space: The Host shall provide Google rack space for the Equipment located at the Space within Host premises.")). The precise location of that space, and thus the server, is reported to Google by the ISP. (Dkt. No. 141-23 at 3 ("Contact & Location Details: As soon as practicable after the Effective Date, the parties will advise each other in writing (which may be sent electronically) of the following: ... (c) Equipment location (address/floor/rack)")). **Further, as noted *supra* at 952–53, "Google's ownership of the server and its contents is absolute, as is its control over the server's location, once installed."** (*See* Dkt. No. 141-23 at 6). Google's ownership of the server and control thereof has not been a focus of Google's objections to proper venue in this District. *Supra* at 953 n. 30.
>
> **Google itself has denoted that the GGC servers are places "of Google."** As the Federal Circuit instructed in *In re Cray*, "a defendant's representations that it has a place of business in the district are relevant." 871 F.3d at 1363. In this respect, "[p]otentially relevant inquiries include whether the defendant lists the alleged place of business on a website," in determining whether "the defendant [has] establish[ed] or ratif[ied] the place of business," within the meaning of the statute. *Id.* Here, Google has done so. Google states on http://peering.google.com that "Our Edge Network is how we connect with ISPs to get traffic to and from users" and that this content traffic "can come from multiple *Google locations, including our data centers Edge PoPs, and Edge Nodes.*" (Dkt. No. 197-1 at 1).

*Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d at 965–66.

**4. This Court should not abandon its fact-intensive approach to venue in favor of a bright-line rule based on the outcomes of *CUPP* and *BMC*.**

Google urges this Court abandon its well-reasoned and fact-intensive decision in *SEVEN Networks* and instead adopt a bright-line rule (that servers are not a place of business) based on the outcomes in *CUPP Cybersecurity, LLC v. Symantec Corp.*, C.A. No. 3:18-CV-01554, 2019 WL 1070869, at *2-3 (N.D. Tex. Jan. 16, 2019) and *BMC Software, Inc. v. Cherwell Software*, LLC, No. 1:17-cv-1074, Dkt. 55 at 3 (E.D. Va. Dec. 21, 2017).

The approach Google urges is inconsistent with *Cray*, which states: "In deciding whether a defendant has a regular and established place of business in a district, *no precise rule has been laid down and each case depends on its own facts.*" *In re Cray Inc.*, 871 F.3d 1355 (Fed. Cir. 2017) (emphasis added).   In *SEVEN Networks*, this Court noted that it was able to reach its conclusions "largely due to the venue discovery Ordered by the Court." *SEVEN Networks, LLC*, 315 F. Supp. 3d at 954, n. 31.  In contrast, venue discovery was denied in both *BMC* and *CUPP*, leading to decisions uninformed by the detailed facts that guided *SEVEN Networks*.

*SEVEN Networks* perfectly illustrates why it would be error to adopt the bright-line rule Google urges.  This Court cannot adopt Google's proposed bright-line rule (that servers and the place of those servers are *never* a regular and established place of business) without ignoring what it knows about Google's control over the GGC servers and the places of those severs.

Even assuming *CUPP* and *BMC* reached the right outcomes, those outcomes do not govern the outcome here.  *SEVEN Networks* was decided on a different set of facts.  As this Court properly recognized, it is those underlying facts, applied to the statutory language, that matter.

**5. There is no requirement of a link between alleged acts of infringement and a defendant's regular and established place of business.**

Google's argument that there must be a "nexus" between its acts of infringement and its regular and established place of business should be rejected for the same reason it was rejected in SEVEN Networks:

> Google argues . . . that the language of § 1400(b) . . . only sets proper venue in a judicial district "where the defendant has committed acts of infringement *at their* regular and established place of business." The clear substitution of statutory language which Google's proposition requires demonstrates that it is incorrect.

* * *

> Nothing in the language of Section 1400(b) justifies the conclusion that a defendant's place of business in the district must have some connection with the accused device. The statute requires only that the defendant have committed acts of infringement in the district and have a regular and established place of business there; there is no requirement that the two factors be related.

*SEVEN Networks*, 315 F. Supp. 3d at 945 (emphasis in original).

Google insists its re-writing of the statute is consistent with the statutory history of the venue statute because it is intended to ensure jurisdiction "would not be conferred by isolated instances of infringement but only where a permanent agency is established."  Google fails to recognize that requiring a "regular and established place of business" already accomplishes this purpose.  As this Court recognized, "it is not 'unfair' to require a defendant to answer suit in a district wherein a defendant has a regular and established place of business *and* is alleged to have committed acts of infringement." *Id.*  (emphasis in original).

### 6.  Google's other places of business in this District

Google insists cell towers in this district used for Google's services are not regular and established places of business of Google, alleging: (1) Google Fi relies on cellular towers of other companies to transmit data and does not own any cell towers in this District; (2) Google does not have any exclusive rights to use the cell towers; and (3) Google has no say as to where the towers are located or how they are operated.  These are similar to allegations Google made about its GGC servers that were later proved false by venue discovery.[13]

Google makes similar allegations concerning Google Cloud Interconnect ("GCI") and Direct Peering, claiming: (1) there is no Google equipment at Megaport's facilities; (2) Google does not own any portion of Megaport or own or lease any of Megaport's facilities; and (3) Google

---

[13] For example, as to Google Fi, public articles indicate Google's service is not merely that of a reseller (as Google suggests). Rather, "in Google Fi's case, a trio of carriers are used — Sprint, T-Mobile and regional carrier US Cellular. For Fi-certified devices, Google says its cellular services determines which carrier has the fastest network where you happen to be and connects you to that one." *See* https://www.tomsguide.com/us/project-fi-faq,review-4530.html. When a Wi-Fi signal is stronger, Wi-fi is used instead of the cell tower (either via a home hot spot or through Google's network of Wi-fi hotpots). *Id.* Also, for this service, "Google has implemented an option called Enhanced Network Beta that routes all internet connections through the company's secure VPN."  *Id.*

does not provide any equipment to Megaport or maintain or locate any of its equipment at Megaport "to facilitate Megaport's connectivity capabilities." As Google did in *SEVEN Networks* concerning GGC servers, Google carefully chooses its words concerning the Megaport facility. Despite Uniloc's allegation that Google holds contractual or property rights to use the space and maintain equipment, Google does not disclose any of the contracts it has with Megaport or CyrusOne.  It's bald statements concerning its relationship with Megaport and the equipment there should not be accepted without venue discovery that includes production of Google's agreement(s) with Megaport.

Google makes similar arguments concerning repair centers and other Google services in this District.

Google's factual assertions concerning Google Fi, cell towers used by Google in this District, GCI, Megaport, and Google's other services in this District should not be resolved without venue discovery.  This Court was able to reach its conclusions in *SEVEN Networks* "largely due to the venue discovery," where this Court noted that it "anticipates it will commonly be asked to permit, on motion, a similar, targeted discovery process to ensure it is able to have a complete picture of the underlying venue facts before attempting to apply the statutory requirements of § 1400(b)."  *SEVEN Networks, LLC*, 315 F. Supp. 3d at 954, n. 31.

Because Google's GGC servers and the place of those servers are enough, alone, to show Google has a regular and established place of business, it should be unnecessary to use party and court resources to conduct discovery on Google's other places of business in this District.  Should this Court have any doubt, however, concerning its decision in *SEVEN Networks*, then Uniloc requests leave to move for limited discovery concerning Google's other places of business.

**B. The complaints in Case Nos. 2:18-cv-00492, -00495, -00497, -00500, -00503, and -00504 sufficiently allege Google has committed acts of infringement in this District.**

In Case Nos. 2:18-cv-00492, -00495, -00497, -00500, -00503, and -00504, Google argues in Section IV C of its motions to dismiss that Uniloc's respective complaints fail to allege acts of infringement in this District.[14]

### 1. Google had knowledge of induced infringement at the time the -00492, -00495, -00497, -00500, -00503, and -00504 complaints were filed.

In each of the cases listed above, Google argues Uniloc fails to allege Google induced or contributed to infringement because Uniloc does not allege Google pre-suit knowledge of the asserted patents. In each case, this argument fails because pre-suit knowledge is not necessary for induced or contributory infringement. *See Tierra Intelectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*, 2:13-CV-44-JRG, 2014 WL 1233040, at *2 (E.D. Tex. Mar. 24, 2014).

Google had knowledge at the time the complaints were filed. *Achates Reference Pub., Inc. v. Symantec Corp.*, 2:11-CV-294-JRG-RSP, 2013 WL 693955, at *3 (E.D. Tex. Jan. 10, 2013), report and recommendation adopted, 2:11-CV-294-JRG-RSP, 2013 WL 693885 (E.D. Tex. Feb. 26, 2013) ("Symantec has had knowledge of the patent, as well as knowledge that the use of the activation component infringes the asserted patents, since at least the time of the filing of the Complaint."). This is sufficient to establish Google committed acts of infringement for purposes of venue.

### 2. Google had pre-suit knowledge.

Further, while pre-suit knowledge is not required, Google cannot plausibly deny that it had pre-suit knowledge. The complaints in Case Nos. 2:18-cv-00492, -00495, -00497, -00500, -00503, and -00504 were each filed on November 17, 2018. But nearly identical complaints were filed weeks before (and later voluntarily dismissed). Google had pre-suit knowledge of the infringement alleged in -00492 because a nearly identical complaint was filed approximately six weeks earlier on October 1, 2018 in Case No. 2:18-cv-00421.[15] Google had pre-suit knowledge of the infringement alleged in -00495, -00497 and -00500 because nearly identical complaints were

---

[14] *See* (492 case) Dkt. No. 17 at 27-29; (495 case) Dkt. 20 at 28-29; (497 case) Dkt. 18 at 27-28; (500 case) Dkt. 18 at 27-29; (503 case) Dkt. 20 at 28-29; (504 case) Dkt. 20 at 28-29.
[15] Uniloc 2017 voluntarily dismissed the -00421 complaint before filing the -00492 complaint.

filed on October 31, 2018 in Case Nos. 2:18-cv-00448, -00450, and -00454.[16]  And Google had pre-suit knowledge of the infringement alleged in -00503 and -00504 because nearly identical complaints were filed on November 1, 2018 in Case Nos. 2:18-cv-00457 and -00458.

### 3.   Google erroneously assumes all alleged infringing activity must have occurred in this District.

In each of its motions challenging acts of infringement, Google attempts to sidestep undisputed allegations in the complaint by alleging one part of the infringing activity does not occur in this district.   Google appears to be again making an argument rejected by this Court in *SEVEN Networks* – that Uniloc 2017 must allege Google alone performs each step of the alleged infringement in this District.  This exact argument has been rejected by the courts, including this one: "Contrary to Plaintiff's argument, not all of the alleged infringing activity needs to have occurred within [the District] so long as some act of infringement took place there."  *Seven Networks*, 315 F. Supp. 3d at 943.

### 4.   The -00492 complaint plausibly alleges acts of infringement in this District.

As alleged in the -00492 complaint, Google's video encoding (e.g., as used in "YouTube") corresponds to the Accused Infringing Devices. *See* ¶¶ 83-94.   In addition to Google using these services itself, it allows its clients (including users in the EDTX) to use such services. *Id.*  For example, Paragraph 83 discusses a YouTube user (including EDTX residents) uploading a video that will be re-encoded and delivered back to other YouTube users (which can also be EDTX residents). *Id.*  As to its own use, Google is believed to use this particular service to provide local channels to EDTX residents, for example, the YouTube TV services referenced in   ¶13. The encoded videos are specifically believed to be delivered through the GGC servers located in the EDTX – the so-called "workhorses of video delivery." *Id.*

Google attempts to side-step these undisputed facts by alleging that one component, an encoding server, is not located in the EDTX.  Although Google does not disclose where such an encoding server is located, this doesn't matter because, for example, the "video" referenced in

---

[16] Uniloc voluntarily dismissed the -00448, -00450, and -00454 complaints before filing the -00495, -00497 and -00500 complaints.

Independent Claim 21 is obtained from EDTX residents and businesses. And the claimed "video stream" is sent to "device[s]" in EDTX. This video may be uploaded by an EDTX user and then sent back to an EDTX user's "device" (see claim language "a transmitter for sending the video stream to a device"). Likewise, the local news channels in the EDTX deliver video to Google for recoding and delivery back to EDTX residents as a "video stream." Or, a user can upload a video from an EDTX server for transcoding and re-downloading back to the same EDTX server.

Google's allegation that one should simply ignore where the information is obtained (here, EDTX residents) and to where it goes (here, EDTX) is analogous to arguments rejected in other contexts under 35 USC 271 (f) and (g) where one might seek to escape infringement by crossing international boundaries. Here, the video content is obtained from the EDTX and the video stream is delivered to devices in the EDTX.

Google likewise does not dispute that it instructs EDTX users on how they can use these services (*see*. e.g., ¶ 93) or how they can benefit from using these service (*see*. e.g., ¶ 84, 85).

### 5. The -00495 complaint plausibly alleges acts of infringement in this District.

As alleged in the -00495 complaint, Google's "Spectrum Access System" or SAS corresponds to the Accused Infringing Devices. *See* ¶¶ 83-95. SAS specifically coordinates wireless spectrum amongst different users to avoid interference. Google does not dispute that the spectrum includes the use of wireless spectrum in the EDTX.

Like multiple other motions, Google attempts to side-step such an undisputed fact by alleging that one component, a database used for SAS, is not located in the EDTX. This is irrelevant. The "stations" referenced in Independent Claim 1 broadcast through the EDTX. Google's SAS coordinates the elimination of interference amongst such differences in the EDTX.

While generally alleging a lack of commercial availability, Google's website states the opposite.[17] Google's carefully worded declaration doesn't allege a lack of stations that coordinate with Google's SAS.

---

[17] *See* https://www.google.com/get/spectrumdatabase/sas/

Google likewise does not dispute that it instructs EDTX users on how they can use these services (*see*. e.g., ¶ 93) or how they can benefit from using these service (*see*. e.g., ¶ 84, 85).  In contrast, Google now provides a certification class.[18]

### 6.   The -00497 complaint plausibly alleges acts of infringement in this District.

As alleged in the -00497 complaint, Google's "YouTube" and "Media & Entertainment Solutions" (e.g., in Google Cloud) correspond to the Accused Infringing Devices. *See* ¶¶ 83-96. In addition to Google using these services itself, it allows its clients (e.g., users in the EDTX) to use such services.  For example, Paragraph 84 discusses a YouTube user (including EDTX residents) uploading a video that will be re-encoded and delivered back to other YouTube users (which can also be EDTX residents).   For other users, Paragraph 85 discusses Google's "Media & Entertainment Solutions" that would enable EDTX to live-stream data for redistribution back to other EDTX user. As to its own use, Google is believed to use this particular service to provide local channels to EDTX residents, for example, the YouTube TV services referenced in  ¶13. The encoded videos are specifically believed to be delivery through the GGC servers located in the EDTX – the so-called "workhorses of video delivery." *Id.*

Like multiple other motions, Google attempts to side-step these undisputed facts by alleging that one component, an encoding server, is not located in the EDTX. This is irrelevant because, for example, the "coded data" referenced in Independent Claim 1 is obtained from EDTX residents and businesses.  For example, the video an EDTX YouTube user uploads may correspond to the "coded data." Likewise, the local news channels in the EDTX delivery "live streams" of "coded data" for recoding and delivery back to EDTX residents. Or, a user can upload a video from an EDTX server for transcoding and re-downloading back to the same EDTX server.

Google's allegation that one should simply ignore where the information is obtained (here, EDTX residents) and to where it goes (here, EDTX) is analogous to arguments rejected in other contexts under 35 USC 271 (f) and (g) where one might seek to escape infringement by crossing international boundaries are passed.

---

[18] *See* https://www.google.com/get/spectrumdatabase/cpi/; https://www.coursera.org/learn/google-cbrs-professional-training

Google likewise does not dispute that it instructs EDTX users on how they can use these services (*see*. e.g., ¶ 93) or how they can benefit from using these service (*see*. e.g., ¶ 84, 85).

### 7.   The -00500 complaint plausibly alleges acts of infringement in this District.

As alleged in the -00500 complaint, Google's video encoding (e.g., as used in its Media and entertainment solutions, YouTube, and Anvato platform) corresponds to the Accused Infringing Devices. *See* ¶¶ 83-95. As noted in the complaint, in addition to Google using these services itself, it allows its clients (e.g., users in the EDTX) use such services. For example, Paragraph 84 discusses a user (including EDTX residents) uploading a video that will be re-encoded and delivered back to other EDTX residents.  A Google customer that use this service is NBC affiliate KETK, which serves the Tyler and Longview markets to deliver video content, for example, on its website – www.easttexasmatters.com.

As to its own use, Google is also believed to use this particular service to provide local channels to EDTX residents, for example, the YouTube TV services referenced in ¶13. The encoded videos are specifically believed to be delivered through the GGC servers located in the EDTX – the so-called "workhorses of video delivery." *Id.*

Like multiple other motions, Google attempts to side-step these undisputed facts by alleging that one component, an encoding server, is not located in the EDTX. This is irrelevant because, for example, the "video data stream" referenced in Independent Claim 1 is obtained from EDTX residents and businesses.  And, the ultimate video is sent to EDTX residents.  For example, this video may be uploaded by an EDTX user and then sent back to another EDTX user.

Google's allegation that one should simply ignore where the information is obtained (here, EDTX residents) and to where it goes (here, EDTX) is analogous to arguments rejected in other context under 35 USC 271 (f) and (g) where one might seek to escape infringement by crossing international boundaries.  Here, the video content is obtained from the EDTX and the video stream is delivered to devices in the EDTX.

Google likewise does not dispute that it instructs EDTX users on how they can use these services (*see*. e.g., ¶ 84) or how they can benefit from using these service (*see*. e.g., ¶ 84, 85).

### 8. The -00503 complaint plausibly alleges acts of infringement in this District.

As alleged in the -00503 complaint, Google's "load balancer" or "health check" service corresponds to the Accused Infringing Devices. *See* ¶¶ 83-104. In addition to Google using these services itself, it allows its clients (e.g., users in the EDTX) to set up and use such services.  ¶¶84, 86 (noting Google's literature statements "[Y]ou must choose and configure the platform components that you want to use . . .  it's your responsibility to configure, administer, and monitor the systems.  Google will ensure that resources are available, reliable, and ready to use, buts it's up to you to provision and manage them.  The advantage, here, is that you have complete control of the systems and unlimited flexibility."). Google's motion should be denied for the simple reason that Google never alleges a lack of users of its service in the EDTX. And, for good reason. As alleged in the complaint, EDTX residents undisputedly use this service; and, Google actively induces such EDTX residents to use this service.  Google does not dispute this.

Like multiple other motions, Google attempts to side-step these undisputed facts by alleging that one component, a server, is not located in the EDTX. This is irrelevant because, for example, Independent Claim 1 recites "routing the traffic from the routing device to a ***second*** server in response to detecting the invalid status message from the ***first*** server." *Id.* (emphasis added).  The so-called first server does not need to be a Google server and can instead be a client server (e.g., in the EDTX) that the client has requested that Google "health check" feature monitor for performance. As a non-limiting example, a Google customer can have servers located at the EDTX Megaport facility described in Complaint at ¶40.  Using the Google Cloud Interconnect features, which Google makes available at this EDTX facility, a customer can enable such a health check feature.

Google also fails to allege that its GGC servers that were acknowledged to be in the EDTX do not use this "health check" feature.

Google likewise does not dispute that it instructs EDTX users on how they can use these services (*see*. e.g., ¶ 91, 94, 100, 102, 105) and the benefits of using the service.  (*see*. e.g., ¶ 88).

### 9. The -00504 complaint plausibly alleges acts of infringement in this District.

As noted in the complaint, Google's "two-step verification" service corresponds to the Accused Instrumentality. *See* Complaint, 503-case, ¶¶ 83-104. Google's motion should be denied for the simple reason that Google never alleges a lack of users of its service in this District. And for good reason. As alleged in the complaint, residents here undisputedly use this service, and Google actively induces residents to use this service. Google does not dispute this.

Google attempts to side-step these undisputed facts by alleging that one component, a server that interacts with EDTX residents, is not located here. Although Google does not inform the Court where these servers are located, it doesn't matter because the claims recite an interaction of the server with user devices, which are indisputably in this district.

For example, as described in the complaint, in infringing Google's servers obtain a "location" and "identity" of the device attempting to access a Google service and then communicates that information to a known device associated with the account – awaiting feedback for approval for the attempted access to be approved. Paragraph 91 of the complaint gave a product testing examples of the two example interactions of the device attempting to access sees and the known device.

Below is a specific example where the accessing device is in the EDTX:



Google likewise does not dispute that it instructs EDTX users on how they can turn this two- step verification service on and off (*see*. e.g., ¶ 88) and how they can benefit by using the service (*see*. e.g., ¶ 88).

## IV.   GOOGLE CANNOT PLAUSIBLY DENY PRESUIT KNOWLEDGE OF INFRINGEMENT.

Google cannot plausibly deny pre-suit knowledge of the infringement described in the complaints.  Weeks before each complaint was filed, nearly identical complaints were filed and later voluntarily dismissed.

### CONCLUSION

For the foregoing reasons, Google's motions to dismiss should be denied.

**Dated: May 20, 2019**                    Respectfully submitted,

                                                           */s/ Ryan S. Loveless*

                                                           James L. Etheridge
                                                           Texas State Bar No. 24059147
                                                           Ryan S. Loveless
                                                           Texas State Bar No. 24036997
                                                           Brett A. Mangrum
                                                           Texas State Bar No. 24065671
                                                           Travis L. Richins
                                                           Texas State Bar No. 24061296
                                                           ETHERIDGE LAW GROUP, PLLC
                                                           2600 E. Southlake Blvd., Suite 120 / 324
                                                           Southlake, Texas 76092
                                                           Telephone: (817) 470-7249
                                                           Facsimile: (817) 887-5950
                                                           Jim@EtheridgeLaw.com
                                                           Ryan@EtheridgeLaw.com
                                                           Brett@EtheridgeLaw.com

                                                           **ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was served upon all counsel of record via the Court's CM/ECF electronic filing system in accordance with the Federal Rules of Civil Procedure on May 20, 2019.

<u>*/s/ Ryan S. Loveless*</u>
Ryan S. Loveless

## CERTIFICATE OF FILING UNDER SEAL

I certify that motions to file under seal were filed in the case as follow on May 20, 2019:

| Case Number | Motion to Seal (Dkt. No) |
|---|---|
| 2:2018cv00491 | 26 |
| 2:2018cv00492 | 23 |
| 2:2018cv00493 | 26 |
| 2:2018cv00494 | 29 |
| 2:2018cv00495 | 24 |
| 2:2018cv00496 | 32 |
| 2:2018cv00497 | 24 |
| 2:2018cv00498 | 27 |
| 2:2018cv00499 | 27 |
| 2:2018cv00500 | 27 |
| 2:2018cv00501 | 22 |
| 2:2018cv00502 | 25 |
| 2:2018cv00503 | 29 |
| 2:2018cv00504 | 28 |

*/s/ Ryan S. Loveless*
Ryan S. Loveless